# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 42087

| | | |
|---|---|---|
| RANDY HOFFER and GALYENA HOFFER, husband and wife, as guardians of the minor child plaintiff, J.S.H., | ) ) ) ) | |
| Plaintiffs-Respondents, | ) | Boise, September 2015 Term |
| | ) | |
| v. | ) | 2016 Opinion No. 105 |
| | ) | |
| SCOTT A. SHAPPARD, D.O.; SAINT ALPHONSUS REGIONAL MEDICAL CENTER, dba SAINT ALPHONSUS MEDICAL GROUP; and GENESIS MEDICAL CENTER, P.A., | ) ) ) ) ) | Filed: September 28, 2016<br><br>Stephen Kenyon, Clerk |
| | ) | |
| Defendants-Appellants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STANLEY J. WATERS, M.D; STANLEY J. WATERS, dba AMERICANA ORTHOPAEDICS; SHANA L. TUBACH, M.D.; and SAINT ALPHONSUS PHYSICIANS, P.A., an Idaho corporation, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Gerald F. Schroeder, Senior District Judge.

The judgment of the district court is affirmed.

Powers Tolman Farley, PLLC, Boise, for appellants Scott A. Shappard, D.O. and Genesis Medical Center, P.A. Raymond D. Powers argued.

Brassey Crawford, PLLC, Boise, for appellant Saint Alphonsus Regional Medical Center. Andrew C. Brassey appeared.

Rossman Law Group, PLLC, Boise, for respondents. Eric S. Rossman argued.

_____

HORTON, Justice.

1

Scott Shappard, D.O., Genesis Medical Center, P.A., and St. Alphonsus Regional Medical Center (collectively "Providers") appeal from an $847,974.46 judgment entered against them after a jury trial. Randy and Galyena Hoffer brought this action on behalf of their minor child, J.H. The jury found that Dr. Shappard negligently and recklessly failed to diagnose J.H.'s medical condition. The district court denied Providers' post-trial motions seeking to correct the verdict, a new trial, and judgment notwithstanding the verdict (JNOV). Providers appeal from the denial of these motions and further assert that the district court erred at trial by refusing to send an exhibit back to the jury room for deliberations and in its jury instructions. We affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This case relates to J.H.'s developmental dysplasia of the hip (DDH), which is an abnormality involving a joint dislocation at the hip. Early diagnosis of DDH in children is important because early treatment is much easier, less invasive, less complicated, and more effective. Risk factors for a child to develop DDH include: breach birth, female gender, premature birth, first-born child, and high birth weight. In order to diagnose DDH, a physician examines the child, looking for palpable hip instability, unequal leg lengths, asymmetrical skin folds, and irregular gait.

J.H., a female child, was born five weeks short of full term in September of 2008. She was Galyena's first child. Various doctors who examined J.H. during the first six weeks of her life did not observe signs of DDH.

Between November 13, 2008, and October 5, 2009, Dr. Shappard saw J.H. for five well-baby examinations. Evidence presented at trial indicated that J.H. had an asymmetrical skin fold at all five examinations. Galyena repeatedly asked Dr. Shappard, through verbal and written questions, about the fold but Dr. Shappard did not recognize the fold as a concern. Galyena repeatedly expressed concern, both verbally and in writing, that J.H.'s legs were not the same length. Dr. Shappard did not find a difference in leg length. At J.H.'s final examination by Dr. Shappard, Galyena asked Dr. Shappard about J.H. walking tip-toe on only one leg. Galyena's testimony and notes regarding her questions reflect that Dr. Shappard responded that such tip-toe walking was normal for children until age two. Galyena also testified that Dr. Shappard never asked to see J.H. walk with parental assistance.

One of the Hoffers' expert witnesses, Dr. David Butuk, opined that Dr. Shappard failed to comply with the community standard of health care practice because of his disregard for the

presence of an obvious asymmetrical skin fold, a difference in leg length, and repeated expressions of parental concern. Dr. Butuk testified that: "Any parent complaint that comes on repeated visits of any concern like that, it's a big red flag. The standard of care is that you have to address that and start moving forward with other ways."

J.H. subsequently had problems while learning to walk that appear to have resulted from DDH. Because of these problems, the Hoffers took her to an orthopedic specialist, Dr. Stanley Waters, for two visits in February and December of 2010. Dr. Waters recognized that J.H. had DDH, but did not tell the Hoffers that she needed immediate treatment. Galyena testified that Dr. Waters told her that "God and nature will take care" of J.H.'s hip.

In May of 2012, the Hoffers took J.H. to Dr. Larry Showalter. Dr. Showalter identified an inch and a half leg difference and the presence of an asymmetrical skin fold. Dr. Showalter immediately ordered x-rays and subsequently performed open reduction surgery in August of 2012, when J.H. was four years old. He testified that the results of the surgery have "so far" been good, but there are risks of "big complications" in the future.

The jury received evidence for nearly two weeks. In addition to medical testimony, the jury heard testimony about J.H.'s future damages. The Hoffers' vocational rehabilitation expert, Douglas Crum, testified that J.H. would need two to three hip replacement surgeries during her lifetime, each resulting in about a 15% loss of function. The Hoffers' economic expert, Dennis Reinstein, testified as to the present value of an individual's expected earning capacity based on four different levels of education.

By special verdict, the jury found that Dr. Shappard had failed to meet the applicable standard of health care practice and that Dr. Shappard's conduct was reckless. The jury apportioned 20% fault to Dr. Waters[1] and the remaining 80% to Dr. Shappard. The jury awarded $289,000 in non-economic damages and $750,000 in economic damages. Providers' counsel received permission from two jurors to speak with them. The two jurors told Providers' counsel that the jury had inadvertently switched the numbers for the non-economic and economic damages award on the special verdict form, but the figures were otherwise correct. Affidavits to this effect from both jurors were filed. The other ten jurors, including the presiding juror, did not speak with Providers' counsel.

---

[1] Dr. Waters settled with the Hoffers prior to trial but was included on the special verdict form for the purpose of apportioning fault.

The district court entered judgment against Providers. Providers moved for JNOV, a new trial, and to correct the verdict. The district court denied these motions. Providers timely appealed.

## II. STANDARD OF REVIEW

"A trial court has broad discretion in ruling on a motion for a new trial." *Blizzard v. Lundeby*, 156 Idaho 204, 206, 322 P.3d 286, 288 (2014). When considering a challenge to a discretionary decision by the trial court, we consider:

> (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standard applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.

*Id.* (quoting *Burggraf v. Chaffin*, 121 Idaho 171, 173, 823 P.2d 775, 777 (1991)). "The trial court is in a far better position to weigh the demeanor, credibility, and testimony of witnesses, and the persuasiveness of all the evidence. Appellate review is necessarily more limited." *Quick v. Crane*, 111 Idaho 759, 770, 727 P.2d 1187, 1198 (1986). "Although this Court necessarily must review the evidence, it primarily focuses on the process by which the district court reached its decision, not on the result of the district court's decision." *Karlson v. Harris*, 140 Idaho 561, 568, 97 P.3d 428, 435 (2004).

This Court reviews jury instructions to determine "whether the instructions as a whole fairly and adequately presented the issues and stated the law." *Schmechel v. Dillé*, 148 Idaho 176, 187, 219 P.3d 1192, 1203 (2009). "Whether the jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review." *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 51, 995 P.2d 816, 821 (2000). "Reversible error occurs if an instruction misleads the jury or prejudices a party." *Id.*

"[T]he interpretation of a rule of evidence, like the interpretation of a statute, is reviewed de novo." *State v. Moore*, 131 Idaho 814, 821, 965 P.2d 174, 181 (1998).

This Court employs the same standard of review as the district court when reviewing a decision to grant or deny a motion for JNOV. *April Beguesse, Inc. v. Rammell*, 156 Idaho 500, 509, 328 P.3d 480, 489 (2014).

> A jury verdict must be upheld if there is evidence of sufficient quantity and probative value that reasonable minds could have reached a similar conclusion to that of the jury. In reviewing a grant or denial of a motion for JNOV the court may not reweigh evidence, consider witness credibility, or compare its factual findings with that of the jury. The court reviews the facts as if the moving party

4

had admitted any adverse facts, drawing reasonable inferences in favor of the non-moving party.

*Id.* (quoting *Athay v. Rich Cnty.*, 153 Idaho 815, 825, 291 P.3d 1014, 1024 (2012)).

## III. ANALYSIS

Providers raise trial-related issues concerning an exhibit and the jury instructions in addition to challenging the denial of their post-trial motions for correction of the verdict, a new trial, and JNOV. We address these issues in turn.

**A. The district court did not abuse its discretion by denying the motion for new trial under Rule 59(a)(7) based upon its refusal to provide the jury with Exhibit LL during deliberations.**

Exhibit LL was an article from *Pediatrics*, the "Official Journal of the American Academy of Pediatrics." The exhibit contained a diagram depicting a clinical algorithm for use in diagnosing DDH. During the trial, defense counsel used the algorithm to demonstrate that Dr. Shappard followed correct procedures. The parties later disputed whether the exhibit should be provided to the jury during its deliberations. The district court held the jury would not be given Exhibit LL, stating:

> The information is before the jury, reference is made to it, they take notes, they know what that is. I don't know what is in the rest of that article other than that diagram, and the risk of sending something in at this point that may have information that has not been explored may or may not exist, but I'm going to treat it as if it does exist, so I will not send that into the jury.

Afterward, Providers challenged this ruling in the motion for a new trial but the district court did not change its ruling. The district court observed that even if the failure to send the exhibit back to the jury room was error, such error would be harmless because the algorithm was discussed before the jurors who had the opportunity to take notes.

Providers attack this ruling, arguing that the exhibit should have been admitted under I.R.E. 803(18) and Idaho Code section 9-402, that the Hoffers waived any objection to Exhibit LL's admission by waiting too long to object, and the Hoffers waived their argument that Exhibit LL should not be admitted because they did not object on hearsay grounds. Providers further argue that this resulted in prejudice because defense counsel told the jurors during closing argument that they would be able to view the algorithm during their deliberations.

Idaho Rule of Civil Procedure 59(a) authorizes a trial court to grant a new trial on several grounds. "[T]he trial court's standard for different grounds enumerated in I.R.C.P. 59(a) varies considerably." *Quick*, 111 Idaho at 771, 727 P.2d at 1199; *see also Carrillo v. Boise Tire Co.*,

152 Idaho 741, 749, 274 P.3d 1256, 1264 (2012). "Under the Idaho Rules of Civil Procedure, a trial court may order a new trial if it determines that legal error occurred during the trial." *Goodspeed v. Shippen*, 154 Idaho 866, 870, 303 P.3d 225, 229 (2013) (citing I.R.C.P. 59(a)(7)). However, the Court does not consider errors that do not affect the parties' substantial rights. *Id.*; *see also* I.R.C.P. 61.

The district court did not err by refusing to send Exhibit LL to the jury room during deliberations. Idaho Rule of Evidence 803(18) provides:

> **Learned Treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or arts, established as a reliable authority by testimony or admission of the witness or by other expert testimony or by judicial notice. *If admitted, the statements may be read into evidence but may not be received as exhibits, except upon motion and order for good cause shown.*

We have not previously interpreted this rule with regard to allowing learned treatises in the jury room. When a federal rule is identical in material respects to an Idaho rule, this Court may consider decisions of the federal courts interpreting the federal rule when interpreting the Idaho rule. *Martin v. Hoblit*, 133 Idaho 372, 376 n. 3, 987 P.2d 284, 288 n. 3 (1999). The last sentence of Federal Rule of Evidence 803(18) is materially identical to the Idaho rule, omitting only Idaho's exception which permits the statements to be received as an exhibit upon a showing of good cause. The final sentence of the federal rule has been interpreted as:

> A safeguard against jury misuse of the published authority . . . . This provision attempts to prevent jurors from overvaluing the written word and from roaming at large through the treatise thereby forming conclusions not subjected to expert explanation and assistance.

Kenneth W. Graham, Jr. & Michael H. Graham, *Rule 803(18): Statements in Learned Treatises, Periodicals, or Pamphlets*, 30C Fed. Prac. & Proc. Evid. § 7059 (2014 ed.).

Exhibit LL was a complete article, but the diagram of the diagnostic algorithm was the subject of primary focus during the trial. The district court did not abuse its discretion when it determined that there were risks associated with the jury being provided the entire article when its contents had not been completely explored. Providers have not shown good cause why the district court should have sent Exhibit LL to the jury room. The jury was presented with the algorithm during trial. The fact that Providers' counsel represented that the jury would have the

6

algorithm during closing arguments, without having received an advance favorable ruling, does not constitute good cause.

Providers did not refer to Idaho Code section 9-402 before the district court. Even if they had, the argument would have been unavailing. The statute provides: "Historical works, books of science or art, and published maps or charts, when made by persons indifferent between the parties, are prima facie evidence of *facts of general notoriety and interest*." I.C. § 9-402. Assuming, without deciding, that the article contained "evidence of facts of general notoriety and interest," the statute is of no force or effect to the extent that it conflicts with the rule. I.R.E. 802 ("Hearsay is not admissible except as provided by these rules or other rules promulgated by the Supreme Court of Idaho."); I.R.E. 1102 ("Statutory provisions and rules governing the admissibility of evidence, to the extent they are evidentiary and to the extent that they are in conflict with applicable rules of Idaho Rules of Evidence, are of no force or effect."). Because there was no basis under the rule for providing the exhibit to the jury, any violation of the statute is not a ground for the relief sought by Providers.

Providers also argue that the Hoffers waived an objection to Exhibit LL being provided to the jury during deliberations because they did not make a hearsay objection and otherwise waited too long to object. This argument fails because from the very beginning the Hoffers made it clear that the contents of Exhibit LL would only be admissible as a learned treatise. When admitted the Hoffers' counsel stated: "I don't object to admitting it as a learned treatise, your Honor, that's fine, *not a substantive admission*."

Finally, even if Exhibit LL should have been given to the jury during deliberations, the failure to give the exhibit to the jury did not affect Providers' substantial rights. As noted by the district court, the jury was presented with the algorithm and considerable accompanying expert testimony during trial, had the opportunity to take notes, and the jury did not request the exhibit during deliberations.

For these reasons, we find no basis for disturbing the verdict based upon the district court's refusal to provide Exhibit LL to the jury during deliberations.

**B. The district court did not err when instructing the jury on negligence and recklessness.**

Providers argued that the district court should have refrained from instructing the jury regarding recklessness until Dr. Shappard had been found to have been negligent. The district court disagreed and instructed the jury of the law regarding recklessness as well as negligence.

7

On appeal, Providers argue that an instruction regarding recklessness was unnecessary until the jury found Dr. Shappard to have been negligent[2] and that the recklessness instruction confused the jury or misled the jury into believing that the district court had found Dr. Shappard to have been negligent. The Hoffers respond that there is no legal basis for requiring the district court to bifurcate the proceedings and there is no indication that the jury was confused or misled by the instructions.

The Hoffers are correct. Providers do not identify any rule of law that would require the trial court to require bifurcated deliberations on negligence and recklessness. As the Hoffers point out, in *Carrillo*, 152 Idaho at 747, 274 P.3d at 1262, we considered an appeal from a decision where the jury was instructed as to both negligence and recklessness, although we were not asked to decide whether such dual instruction constituted error. Providers point to *Schmechel v. Dillé*, 148 Idaho 176, 219 P.3d 1192 (2009), in support of their contention that the district court should have bifurcated the proceedings. However, *Schmechel* did not announce a requirement that the district court bifurcate deliberations as to negligence and recklessness. *See Schmechel*, 148 Idaho at 187, 219 P.3d at 1203. Instead, this Court merely held that that the district court did not abuse its discretion by choosing to not instruct the jury on recklessness until the jury returned a verdict in excess of the statutory cap. *Id.*

There is no factual support for Providers' argument that the jury was actually confused. The special verdict form submitted to the jury was not confusing. The final question, asking whether Dr. Shappard was reckless, was distinct from an earlier question asking whether Dr. Shappard breached the applicable standard of health care practice.

Providers direct our attention to a question from the jury, contending that the question demonstrates that the jury was confused by the recklessness instruction and did not fully appreciate the significance of a finding that he was reckless. During their deliberations, the jurors asked: "Are there penalties for Dr. Shappard and/or Dr. Walters for willful and wanton, or reckless misconduct as defined in these instructions? What are they?" Far from suggesting confusion on the part of the jurors, this question shows the jury fully understood that a finding

---

[2] During oral argument, Providers' counsel advanced an argument that the substantive content of the recklessness instruction was erroneous. However, the record does not reveal such an objection before the trial court. A party cannot raise an issue on appeal that relates to "the giving of a jury instruction that misstates the law unless the party timely objected to the specific instruction on the record, stating the grounds of the objection." *Bolognese v. Forte*, 153 Idaho 857, 867 n.6, 292 P.3d 248, 258 n.6 (2012); *see also* I.R.C.P. 51(b). Therefore, we do not consider this claim.

that Dr. Shappard was reckless was distinct from finding that he had breached the applicable standard of health care practice.

Because there was no legal requirement that the district court bifurcate the jury's deliberations and there is nothing to suggest that the jury was, in fact, confused by the instructions, we can find no error in the district court's decision to simultaneously instruct the jury on recklessness and negligence.

### C. The district court did not err in denying the motion to correct the verdict.

The district court determined that the plain language of Idaho Rule of Evidence Rule 606(b) ("Rule 606(b)") precluded consideration of juror affidavits that alleged that the special verdict form was erroneously filled out. On appeal, Providers argue that they seek a "ministerial correction" of the verdict rather than an inquiry into the "validity" of the verdict. Providers argue that Idaho case law allows ministerial correction of a verdict and that Rule 606(b) only governs the inquiry into the validity of a verdict when a party is seeks to impeach the verdict.

The plain language of Rule 606(b) does not allow clerical corrections as Providers claim. The rule provides:

> **(b) Inquiry to Validity of Verdict or Indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes, but *a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror and may be questioned about or may execute an affidavit on the issue of whether or not the jury determined any issue by resort to chance.*

"We begin with an examination of the literal words of the rule and give the language its plain, obvious and rational meaning." *Miller v. Haller*, 129 Idaho 345, 350, 924 P.2d 607, 612 (1996) (discussing Rule 606(b)). Interpreting this rule, this Court has stated:

> In addition to specifying which matters jurors are prohibited from testifying about, the Idaho Rules of Evidence expressly describe *the only matters jurors may testify to*: "[A] juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror and . . . whether or not the jury determined any issue by resort to chance."

9

*Levinger v. Mercy Med. Ctr., Nampa*, 139 Idaho 192, 197, 75 P.3d 1202, 1207 (2003) (quoting Rule 606(b)). This Court's interpretation is consistent with the maxim of construction *expressio unius est exclusio alterius*, meaning that where a law expressly designates something, the "designation of such things excludes all others." *Idaho Press Club, Inc. v. State Legislature of the State*, 142 Idaho 640, 642, 132 P.3d 397, 399 (2006) (quoting *Local 1494 of Int'l Ass'n of Firefighters v. City of Coeur d'Alene*, 99 Idaho 630, 639, 586 P.2d 1346, 1355 (1978)).

However, Providers argue that they only seek a "ministerial correction" to the verdict, rather than an inquiry into the "validity" of the verdict. Providers correctly observe that, for a significant time, the corresponding federal rule of evidence was identical and many federal courts held that Federal Rule of Evidence 606(b) did not apply to clerical errors because corrections of such errors do not concern the validity of a verdict or the jurors' mental processes. Committee Notes on Rules—2006 Amendment. However, as noted by the rules advisory committee, this exception represented a "divergence" from the "text of the rule." *Id.* Consequently, in 2006, Federal Rule of Evidence 606(b) was amended to create an exception for when "a mistake was made in entering the verdict on the verdict form."

Some state courts have taken a plain language approach to interpreting provisions similar to Rule 606(b). *See, e.g., Waste Mgmt. of Arkansas, Inc. v. Roll Off Serv., Inc.*, 199 S.W.3d 91, 95 (Ark. 2004) ("[W]e are reluctant to craft an exception to Rule 606(b) that goes beyond those stated in the rule itself."). We are likewise reluctant to create an exception to I.R.E. 606(b) that is not found within the rule's text.

Providers point to *Umphrey v. Sprinkel*, where this Court held "that courts may consider affidavits in order to clarify what the verdict was, but not to impeach the verdict." 106 Idaho 700, 707, 682 P.2d 1247, 1254 (1983). *Umphrey* does not assist us in our decision. The decision predated our adoption of Rule 606(b) in 1985 and, unlike the congressional action taken as to Federal Rule of Evidence 606(b), this Court has not amended Rule 606(b) to provide an exception for clerical error. Based upon the plain language of the rule, we hold that the district court did not err by ruling that consideration of the two juror's affidavits would violate Rule 606(b).

**D. The district court did not abuse its discretion by denying Providers' motion for new trial.**

Providers' unsuccessful motion for a new trial rested on two distinct grounds. We will discuss those grounds in turn.

10

1. **Motion for new trial based on Idaho Rule of Civil Procedure 59(a)(6) ("Rule 59(a)(6)")**

The district court determined that there was sufficient evidence to support the jury's finding of recklessness. Providers challenge this finding, contending that the district court abused its discretion by failing to acknowledge evidence and testimony that conflicted with the jury's finding of recklessness. As will be discussed more fully in Part III(E)(2), *infra*, our determination that Rule 606(b) does not permit consideration of juror affidavits for purposes of correcting alleged clerical errors in a special verdict form means that the jury's finding of recklessness is without legal significance. Nevertheless, we take this opportunity to reiterate our position as to the sufficiency of trial courts' findings for appellate review of decisions on a motion for new trial.

Under Rule 59(a)(6), a court may grant a new trial for "[i]nsufficiency of the evidence to justify the verdict." "Under Rule 59(a)(6), the trial judge *must* weigh the evidence and determine (1) whether the verdict is against his or her view of the clear weight of the evidence; and (2) whether a new trial would produce a different result." *Carrillo v. Boise Tire Co.*, 152 Idaho 741, 749, 274 P.3d 1256, 1264 (2012) (emphasis original) (quoting *Harger v. Teton Springs Golf and Casting, LLC*, 145 Idaho 716, 718, 184 P.3d 841, 843 (2008)). If a disparity in the amount that the trial judge would have awarded "is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand." *Id.* (quoting *Harger*, 145 Idaho at 718–19, 184 P.3d at 843–44).

Here, the district court determined that there was sufficient evidence to support the jury's finding of recklessness because "continued concerns" were expressed by the Hoffers, there were objective signs of DDH, imaging was simple and would have been conclusive, and the problem compounded with the passage of time. In light of this evidence, the district court determined that "[t]he jury verdict is not against the clear weight of the evidence" and "[i]t is not likely that a different result would occur if the case were retried." While the district court did not expressly state it was considering the motion under Rule 59(a)(6), its analysis addressed the inquiries necessary to decide a motion based upon Rule 59(a)(6). The district court properly determined whether, in its view, the verdict was against the clear weight of the evidence and whether a new trial would produce a different result. There is no procedural error in the district court's approach.

Providers argue that the district court should have more thoroughly addressed other testimony and evidence, such as testimony that DDH is difficult to diagnose and the algorithm, previously discussed, which Providers allege shows that Dr. Shappard followed the correct procedure for diagnosing DDH.[3] Providers argue the district court's new trial analysis "commit[ted] the fatal mistake of piggy-backing its new trial analysis on its analysis under the JNOV standard" because it only addressed evidence that supported the jury's findings. However, the district court expressly recognized the different standards which apply to the different motions, stating:

> In considering a motion for new trial the trial court is not required to draw all inferences in favor of the non-moving party and accept the truth of the prevailing party's evidence. In considering a motion for new trial the trial judge evaluates whether the verdict is consistent with the clear weight of the evidence.

Our reading of the district court's memorandum decision shows that, when fulfilling its duty to independently evaluate the weight of the evidence, the district court simply discussed the evidence that it found to be most persuasive. *See Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775, 781, 25 P.3d 88, 94 (2001) (holding a district court's "determination to discount the testimony of the defendant's expert witnesses was a proper exercise of his discretion in weighing the demeanor, credibility and persuasiveness of the evidence" when ruling on a motion for a new trial). We can find no error simply because the district court did not exhaustively discuss all evidence presented in the course of trial. Providers have not shown that the district court abused its discretion by denying the motion for new trial based on Rule 59(a)(6).

## 2. Motion for new trial based on Idaho Rule of Civil Procedure 59(a)(5) ("Rule 59(a)(5)")

"To uphold a ruling under Idaho R. Civ. P. 59(a)(5), it must be evident that the trial court (1) contemplated what it would have awarded if it had been the finder of fact and (2) determined that any difference between the jury award and what the trial court would have awarded is not so great as to show a verdict based on prejudice or passion." *Hei v. Holzer*, 145 Idaho 563, 569, 181 P.3d 489, 495 (2008) (citing *Tuttle v. Wayment Farms, Inc.*, 131 Idaho 105, 107, 952 P.2d 1241, 1243 (1998)). When denying the motion for new trial, the district court stated: "The court cannot

---

[3] Providers also contend that Dr. Shappard's conduct was not nearly as culpable as that of Dr. Waters because Dr. Waters was an orthopedic surgeon (in contrast to Dr. Shappard, who was a family doctor) who diagnosed J.H.'s DDH but told the Hoffers that God and nature would cure her. The district court correctly observed that "[t]he conduct of Dr. Waters is irrelevant to the finding as to Dr. Shappard. His conduct came after Dr. Shappard's. The jury could evaluate the conduct of each, as it did, and assign[] fault as it did."

say the jury verdict on the issue of recklessness, *or any other issue*, is against the clear weight of the evidence." Providers contend that the jury's award of special damages for lost future income was "excessive given the lack of evidence to support such an award and was the result of passion and prejudice."

A preliminary issue is whether the district court adequately analyzed the motion under Rule 59(a)(5). The district court's opinion does not cite Rule 59(a)(5) and Providers point out that the district court did not discuss the differences between Rule 59(a)(5), (6), and (7).

This Court has ruled a district court "must disclose [the] reasoning for granting or denying motions for a new trial . . . unless those reasons are obvious from the record itself." *Quick v. Crane*, 111 Idaho 759, 772, 727 P.2d 1187, 1200 (1986). Providers rely on *Quick* to support their claim that the district court inadequately discussed the grounds for refusing to grant the motion for new trial. In *Quick*, this Court remanded a case to a district court so that the district court could state its reasons for denying each of a defendant's separate motions when the extent of the court's explanation for its decision was:

> I am going to at this time deny the motion for a new trial and the motion for judgment notwithstanding a verdict and motion for remittitur. Its [sic] the court's feeling that there is ample evidence before this jury to justify these verdicts.

*Id.* at 763, 727 P.2d at 1191. This Court ruled that "since the trial court made no reference to either I.R.C.P. 59(a)(5) or the language contained in that rule, it is impossible for this Court to determine whether the trial court even ruled on that part of the defendants' motion, let alone whether he applied the correct standard for that rule." *Id.* at 771, 727 P.2d at 1199. The Court reasoned that it was difficult to review a decision under the abuse of discretion standard, which focuses on the district court's process, when all that the record contained was the district court's conclusion. *Id.* at 772, 727 P.2d at 1200.

Here, the district court's written opinion went far beyond the summary conclusion that was before the Court in *Quick*. Although the district court did not specifically cite to Rule 59(a)(5), it did state that it had weighed the evidence and determined that the jury verdict was not against the clear weight of the evidence. Although the district court did not state what specific award it would have made, this Court has not required that the trial judge's Rule 59(a)(5) analysis include "any specific evaluation of the award he would have made;" rather, it is sufficient if the trial court's decision reflects that the judge examined the damage award to ascertain whether it was the product of passion or prejudice. *Highland Enters., Inc. v. Barker*,

13

133 Idaho 330, 347, 986 P.2d 996, 1013 (1999). Thus, the district court's failure to identify the sum it would have awarded to the Hoffers does not require us to remand for further findings.

Although a motion for JNOV and a motion for new trial present distinct inquiries, the district court's JNOV analysis assists us in determining the basis for the denial of the motion for new trial. In the context of Rule 59(a)(6) motions, we have stated: "A trial court need not separately restate and reanalyze the same facts or evidence in deciding an I.R.C.P. 59(a)(6) motion for a new trial that were previously applied in deciding a motion for J.N.O.V. where a proper disposition of each motion necessarily rests upon the same facts or evidence." *Karlson v. Harris*, 140 Idaho 561, 570, 97 P.3d 428, 437 (2004). In its JNOV analysis, the district court stated there was "extensive and complex" evidence that J.H. would have "likely limitations" in the workforce and in earning capacity. These statements clearly reflect that the district court had weighed the evidence and concluded that there was sufficient evidence to support the award for lost future earnings. We can find no abuse of discretion in the denial of the motion for new trial.

**E. The district court did not err in denying Providers' JNOV motion.**

The district court denied Providers' motion for JNOV, holding that substantial and competent evidence supported the jury's findings that (1) Dr. Shappard was reckless and (2) J.H. suffered $750,000 in economic damages. Providers challenge these determinations. We address them in turn.

**1. We do not address the jury's finding of recklessness because the verdict can be upheld on the independent finding that Dr. Shappard's conduct was negligent.**

The district court determined that adequate evidence supported the jury's finding that Dr. Shappard was reckless and negligent. On appeal, Providers argue that substantial and competent evidence does not support the jury's recklessness finding but do not challenge the jury's finding that Dr. Shappard was negligent. The Hoffers argue that whether Dr. Shappard was reckless "has no effect on the verdict" because the jury's verdict can be upheld simply on the basis of Dr. Shappard's negligence.

The parties' dispute centers on Idaho Code section 6-1603. The statute imposes an inflation-adjusted[4] cap on noneconomic damages in personal injury cases. The cap does not

---

[4] Idaho Code section 6-1603 was amended in 2003 to establish a $250,000 cap on noneconomic damages, with adjustments calculated as follows: "beginning on July 1, 2004, and each July 1 thereafter, the cap on noneconomic damages established in this section shall increase or decrease in accordance with the percentage amount of increase or decrease by which the Idaho industrial commission adjusts the average annual wage as computed pursuant to section 72–409(2), Idaho Code." 2003 Idaho Sess. L. ch. 122, § 2, p. 371.

apply to "[c]auses of action arising out of willful or reckless misconduct." The parties do not dispute that $289,000 is less than the cap provided by Idaho Code section 6-1603.

As discussed in Part III(C), *supra*, Rule 606(b) precludes consideration of juror affidavits as a basis for "correcting" a verdict. Providers have not identified another legal basis for this Court to direct the trial court to amend the jury's verdict by substituting $750,000 for $289,000 as the amount of noneconomic damages award. Thus, for purposes of the JNOV, the jury's noneconomic damages award of $289,00 continues to stand. Because this figure is less than the statutory cap and Providers do not challenge the jury's finding that Dr. Shappard was negligent apart from the grounds previously discussed, the jury's finding of recklessness is without legal significance.

"The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." I.R.C.P. 61; *see also Goodspeed v. Shippen*, 154 Idaho 866, 870, 303 P.3d 225, 229 (2013). Because the jury's award may be sustained solely upon its finding of negligence, there is simply no reason for us to consider whether substantial and competent evidence supports the jury's finding of recklessness.

Providers argue that we should address whether Dr. Shappard's conduct was reckless because a label of recklessness will have future, unspecified impacts on Dr. Shappard and this case will establish precedent affecting other physicians. We are not so persuaded. "Because an appellant can only prevail if the claimed error affected a substantial right, the appellant must present some argument that a substantial right was implicated." *H.F.L.P., LLC v. City of Twin Falls*, 157 Idaho 672, 686, 339 P.3d 557, 571 (2014). Providers have failed to identify any impact on Dr. Sheppard resulting from the recklessness finding. Even if other physicians might benefit from a ruling on this issue—a dubious proposition—such benefit would have no effect on Providers' substantial rights. For these reasons, we do not reach the substance of Providers' arguments.

## 2. Substantial and competent evidence supported the jury's award of damages for lost future income.

The district court determined that the evidence supporting the economic damages award was "extensive and complex" in light of medical, vocational, and economic testimony presented at trial. Providers argue that the jury's award of special damages for lost future income was not supported by substantial and competent evidence.

15

The jury awarded $750,000 in economic damages. Although the special verdict did not specify the components of this award, Providers acknowledge that the evidence presented at trial would support an award of approximately $438,000[5] for past and future medical expenses, meaning that the jury awarded approximately $312,000 for future lost earnings. Providers challenge the sufficiency of evidence supporting the award for lost future income.

"[D]amages for lost earnings in the future must be shown with reasonable certainty and compensatory awards based on speculation and conjecture should not be allowed." *Bailey v. Sanford*, 139 Idaho 744, 751, 86 P.3d 458, 465 (2004) (quoting *Warren v. Furniss*, 124 Idaho 554, 559–60, 861 P.2d 1219, 1224–25 (Ct. App. 1993)). "To show future lost earnings with reasonable certainty, the claimant must prove the extent to which her future earning power was impaired." *Id.* "Reasonable certainty requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation." *Saint Alphonsus Diversified Care, Inc. v. MRI Assocs., LLP*, 157 Idaho 106, 116, 334 P.3d 780, 790 (2014) (quoting *Griffith v. Clear Lakes Trout Co., Inc.*, 146 Idaho 613, 618, 200 P.3d 1162, 1167 (2009)).

The Hoffers' vocational rehabilitation expert, Douglas Crum, testified that he understood that medical opinions showed J.H. would have "between two and three hip replacement surgeries during her lifetime" and that there would be "about a 15 percent loss of function each time those surgeries were performed." Crum also testified that J.H. would lose employment opportunities because she would be limited to sedentary work. He further testified that disabled workers have higher unemployment rates; disabled "individuals in the labor market ages 21 to 64 have a median income that is 28 percent less than those with no disability;" disabled workers are perceived as problem workers; J.H. would lose time at work in connection with hip replacement surgeries and would have a period of reduced function prior to each surgery; and he had worked with hundreds of people with orthopedic problems and it is not uncommon for complications to occur.

The Hoffers' economic expert, Dennis Reinstein, provided the jury with tables showing the present value of a person's expected earning capacity based on four different levels of educational attainment. Reinstein testified that the present value of the earning capacity of a

---

[5] J.H.'s past medical care cost $38,928.82 and Dennis Reinstein testified that the present value of future medical care is $398,752, for a total of $437,680.82. The balance of the jury's award for future loss of earnings would thus be $312,319.18.

person with a college degree is reduced by $12,513 for each percent of impairment. The Hoffers correctly note that $12,513 multiplied by an impairment rating of 25% ($312,825) is almost exactly equal to the amount of the jury's award that the parties attribute to lost future earnings. Although we cannot know how the jury arrived at its award, it is clear that the amount of the award is consistent with the expert testimony presented to the jury by the Hoffers.

Providers contend that Crum's testimony was insufficient to support the award of damages for loss of future earnings, arguing it was speculative because it was not supported by medical testimony. Providers clarify that they do not challenge the admission of Crum's testimony; rather, they claim the lack of supporting medical testimony means that Crum's testimony provided too uncertain a basis to support the award for lost future earnings.

As to the "medical foundation" for his testimony, Crum testified that he had primarily relied upon the opinions of one of the Hoffers' expert witnesses, Dr. Eric Gordon, a pediatric orthopedic surgeon. Those opinions were contained in a deposition and disclosures that Crum reviewed. Dr. Gordon had previously testified at the trial. Crum testified that his understanding of J.H.'s future medical needs was also "supported" by a disclosure from Dr. Bozic that he had read. Dr. Bozic, who did not testify at trial, is a joint replacement specialist.

Providers challenge Crum's reliance on these physicians' opinions, noting that Dr. Bozic was not a witness at trial and that Dr. Gordon did not quantify J.H.'s degree of impairment or testify that J.H. would require three future hip replacements. However, Providers identify nothing in the rules of evidence that require Dr. Bozic to have testified in order for Crum to have relied upon his opinions when formulating his own. Indeed, our rules of evidence explicitly permit experts to base their opinions on evidence that may not be admissible. I.R.E. 703. Significantly, Providers did not object to Crum's opinions.

Dr. Gordon testified that J.H. "will end up having arthritis probably in [J.H.'s] 30s to 40s" and that DDH would affect J.H.'s future ability to work and limit J.H. to sedentary jobs. He testified that: "My best guess is that probably [J.H.] will end up starting to get arthritis sometime in 30s to 40s and probably ultimately a total hip [replacement], I would guess, probably around 40 or somewhere along those lines."

Providers' argument that insufficient evidence was presented at trial relating to J.H.'s future medical needs overlooks the testimony of one significant witness. Kelly Lance, a family nurse practitioner, testified extensively regarding her consultations with Dr. Gordon regarding

17

J.H.'s future medical needs in the preparation of J.H.'s life care plan. Lance testified that Dr. Gordon held the opinion, to a reasonable degree of medical probability, that J.H. would require hip replacement surgeries approximately twenty years apart, for a total of three such procedures. Providers did not object to this testimony.

While Providers are correct that it is impossible to predict the exact frequency with which J.H. will require surgical intervention that interferes with her future earning capacity, we have recognized that justice and public policy require the wrongdoer to bear the risk of uncertainty that is inherent in claims for prospective loss. *Saint Alphonsus Diversified Care, Inc.*, 157 Idaho at 116, 334 P.3d at 790. Lost future earnings need only be shown with reasonable certainty, not absolute assurance or mathematical exactitude. *Id.* We hold that the award for lost future earnings was supported by substantial and competent evidence.

**F. The Hoffers are entitled to attorney fees on appeal.**

The Hoffers seek attorney fees on appeal under Idaho Code section 12-121. The parties dispute whether the issues argued by Providers have been frivolous. Although we will address these arguments, we take this opportunity to announce that the courts of this state will apply a different standard to claims for attorney fees under the statute, effective March 1, 2017. The future standard to be applied is that which the Legislature has specified.

> Idaho Code section 12-121 provides:
>
> > In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties, provided that this section shall not alter, repeal or amend any statute which otherwise provides for the award of attorney's fees. The term "party" or "parties" is defined to include any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof.

"The objective of statutory interpretation is to give effect to legislative intent." *State v. Yzaguirre*, 144 Idaho 471, 475, 163 P.3d 1183, 1187 (2007). "When interpreting a statute, the Court begins with the literal words of the statute . . . ." *Williams v. Blue Cross of Idaho*, 151 Idaho 515, 521, 260 P.3d 1186, 1192 (2011). "If the statutory language is unambiguous, the clearly expressed intent of the legislative body *must* be given effect . . . ." *Idaho Youth Ranch, Inc. v. Ada Cnty. Bd. of Equalization*, 157 Idaho 180, 184–85, 335 P.3d 25, 29–30 (2014) (internal quotations omitted) (quoting *St. Luke's Reg'l Med. Ctr., Ltd. v. Bd. of Comm'rs of Ada Cnty.*, 146 Idaho 753, 755, 203 P.3d 683, 685 (2009)). This Court does not have the authority to modify an unambiguous legislative enactment. *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151

18

Idaho 889, 895, 265 P.3d 502, 508 (2011) (quoting *Berry v. Koehler*, 84 Idaho 170, 177, 369 P.2d 1010, 1013 (1962)).

Idaho Code section 12-121 was enacted in 1976 and amended by addition of the second sentence in 1987. 1976 Idaho Sess. L. ch. 349, p. 1158; 1987 Idaho Sess. L. ch. 263, p. 555. For a period of time after its enactment in 1976, the decision to award attorney fees was committed entirely to the sound discretion of the court. *Anderson v. Ethington*, 103 Idaho 658, 660, 651 P.2d 923, 925 (1982); *Odziemek v. Wesely*, 102 Idaho 582, 583, 634 P.2d 623, 624 (1981); *Futrell v. Martin*, 100 Idaho 473, 479, 600 P.2d 777, 783 (1979).

Effective March 1, 1979, this Court adopted Idaho Rule of Civil Procedure 54(e)(1) ("Rule 54(e)(1)"),[6] which limited courts' previous broad discretion to award attorney fees to those instances where the case was "brought, pursued or defended frivolously, unreasonably or without foundation."[7] I.R.C.P. 54(e)(1).

The language that was initially adopted by the legislature plainly granted broad authority to judges overseeing civil actions to award reasonable attorney fees. The plain language of the statute did not evince the bias against attorney fee awards that is exhibited by the restrictive "frivolous, unreasonable, or without foundation" standard of the court rule. The Legislature's decision to employ the word "may" reflects a clear intent to grant discretion to courts to award attorney fees to prevailing parties. *See Rife v. Long*, 127 Idaho 841, 848, 908 P.2d 143, 150 (1995) ("This Court has interpreted the meaning of the word 'may' appearing in legislation, as having the meaning or expressing the right to exercise discretion."). This discretion is broad since, unlike this Court's rule, Idaho Code section 12-121 contains no language limiting the court's discretion.

Since the rule was adopted, the Legislature has expressed an intention to confer greater discretion to courts than is found within the rule. House Bill 263, the 1987 legislation that resulted in the amendment to Idaho Code section 12-121, contained an uncodified statement of legislative intent: "It is the intent of the legislature of the state of Idaho that this act grant

---

[6] On July 1, 2016, Rule 54(e)(1), was divided into distinct subsections. The provisions relating to Idaho Code section 12-121 are now designated as Idaho Rule of Civil Procedure 54(e)(2).

[7] The rule was adopted because proponents of the rule were concerned by a lack of uniform application of the statute by judges, result in "judge shopping." Hon. Justice Jesse R. Walters, Jr., *A Primer for Awarding Attorney Fees in Idaho*, 38 Idaho L. Rev. 1, 18 (2001). Opponents of Rule 54(e)(1) contended that its adoption violated separation of powers principles because the Court had effectively amended Idaho Code section 12-121 by adopting the rule. *See, e.g., Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 922, 591 P.2d 1078, 1089 (1979) (Bistline, J., specially concurring).

19

prevailing litigants in civil actions the right to be made whole for attorney's fees and costs when justice so requires." 1987 Idaho Sess. L. ch. 263, § 1, p. 555.[8] This Court had previously recognized that this was the purpose for which Idaho Code section 12-121 was originally adopted. *Futrell*, 100 Idaho at 479, 600 P.2d at 783 ("The purpose of I.C. § 12-121 was in proper cases to impose the actual costs of litigation on the unsuccessful parties, in the court's discretion."). We are unable to continue to ignore the clear intention of the Legislature by continuing to apply the court rule. Thus, in the near future, the courts of this state will apply the standard expressed by the Legislature: prevailing parties in civil litigation have the right to be made whole for attorney fees they have incurred "when justice so requires."

We recognize that today's decision overturns a vast body of case law interpreting Idaho Code section 12-121 through the distorting lens of Rule 54(e)(1) and are fully mindful of the constraints imposed by the doctrine of stare decisis. Stare decisis requires that this Court follow "controlling precedent unless that precedent is manifestly wrong, has proven over time to be unjust or unwise, or overruling that precedent is necessary to vindicate plain, obvious principles of law and remedy continued injustice." *State v. Owens*, 158 Idaho 1, 4–5, 343 P.3d 30, 33–34 (2015).

We can conceive of no principles of law that are more plain or obvious than these: (1) it is the province of the Legislature to make and amend laws; and (2) this Court is without authority to amend laws enacted by the Legislature because we think them unwise. *See* Idaho Const. art. III, § 1 (The legislative power of the state shall be vested in a senate and house of representatives. . . ."); Idaho Const. art. II, § 1 ("no . . . collection of persons charged with the exercise of powers properly belong to one of these departments shall exercise any powers properly belong to either of the others. . . ."). Because the court rule is inconsistent with the constitutional allocation of powers between the coordinate branches of Idaho's state government, it may no longer be applied.

We recognize that this Court's long-belated recognition of express legislative intent may have profound effects on litigants. Thus, we have determined that it is appropriate to give the

---

[8] All portions of a bill that is passed by the Legislature become law in the absence of a gubernatorial veto, even if not compiled in the Idaho Code. We recently explored this issue in *Peterson v. Peterson*, 156 Idaho 85, 320 P.3d 1244 (2014). There, the district court held that a retroactivity clause contained within a bill which was not assigned a statutory designation within the Idaho Code "was merely legislative history" and could not be considered when reviewing unambiguous statutes. *Id.* at 88, 320 P.3d at 1247. We held that the district court erred in so holding, stating: "The entire bill became a law regardless of how it was compiled in the Idaho Code." *Id.* When House Bill 253 became law in 1987, Section 1 became law, despite the absence of a statutory designation.

bench and bar advance notice of the effective date of the new rule. This new rule of law will become effective on March 1, 2017, and will have prospective effect, applying to all cases that have not become final as of that date.[9]

Next, we turn to the Hoffers' claim for attorney fees on appeal where we will apply the current standard and evaluate whether Providers' appeal was pursued "frivolously, unreasonably or without foundation." We find this to be such an instance. In our view, Providers' appeal was little more than a request that this Court ignore the plain language of Idaho Rule of Evidence 803(18) and second-guess the jury and district court by reweighing the evidence. For this reason, we award the Hoffers attorney fees incurred in the defense of this appeal.

## IV. CONCLUSION

We affirm the judgment of the district court. We award attorney fees and costs on appeal to the Hoffers.

Chief Justice J. JONES and Justice EISMANN, **CONCUR**.

BURDICK, J., concurring and dissenting.

I concur in all portions of the opinion; however, I cannot agree with Part III(F), where the majority decides to repeal Idaho Rule of Civil Procedure 54(e)(2) and, in doing so, to overturn a vast body of Idaho law. I see no reason in light of the many attorney fee statutes that the Idaho legislature has imposed upon its citizens to make such a drastic change.

The majority decides to replace Rule 54(e)(2)'s enumerated grounds—frivolous, unreasonable, or without foundation—with a standard permitting attorney fees to be awarded "when justice so requires." The majority highlights awarding attorney fees "when justice so requires" honors the Legislature's intent and Idaho Code section 12-121's plain language. Yet the majority leaves trial judges at bay, with no guidance to decipher when justice will "so require" attorney fees to be awarded. I believe that Rule 54(e)(2)'s enumerated grounds filled this void by accurately defining "when justice so requires." Additionally, Rule 54(e)(2)'s enumerated grounds gave sideboards to trial courts' discretion. However now, with such an amorphous standard, there will be no effective appellate review of attorney fee awards.

---

[9] On September 7, 2016, this Court voted to amend Rule 54(e), Idaho Rules of Civil Procedure, by rescinding subsection 2, effective March 1, 2017.

21

I agree that the Idaho Legislature may pass attorney fee statutes, but on the other hand, I believe that the Idaho judiciary has the right to promulgate reasonable rules that will in fact help trial courts follow that statutory enactment. *E.g.*, I.C. § 1-212 ("The inherent power of the Supreme Court to make rules governing procedure in all the courts of Idaho is hereby recognized and confirmed."). To that end, I see Rule 54(e)(2) as nothing more than a guide to help Idaho's trial judges define "when justice so requires."

Moreover, I believe that the majority's analysis will further inhibit access to justice and tilt the table even further toward moneyed interests in our courts. The majority's analysis signifies a prominent step toward adopting the English Rule of attorney fee awards, whereby the losing party must pay for the prevailing party's attorney fees. It is well established that broad, discretionary fee-shifting statutes raise the stakes in litigation—that is, parties will litigate not just for a judgment, but to obtain payment of their attorney fees and to avoid the other party's attorney fees.[10] As a result, the majority's analysis will chill litigation. And, with litigants reluctant to vindicate their rights in court, I perceive that litigants will actually have to spend more on litigation costs. The cost of litigation in Idaho will now reflect the prospect of having to pay the adverse party's attorney fees. Indeed, I draw attention to Chief Justice Jones's concurring opinion in *Eyer v. Idaho Forest Grp.*, S. Ct. No. 43532 (2016) (Jones, C.J., concurring) (acknowledging "the legal system catastrophically failed [the appellants]" because they were required to pay a minimum of $185,755.30 of attorney fees after unsuccessfully seeking redress for a $1,600 timber trespass). This, in turn, will inhibit the valuable advancement of Idaho common law and deter litigation for new causes of action. In this case, the Court could have and did assert that attorney fees were proper under existing Idaho Code section 12-121 and Idaho Rule of Civil Procedure 54(e)(2). Therefore, this drastic action should not have been taken without further input from judges and attorneys.

Justice W. JONES CONCURS.

---

[10] The United States Supreme Court recognized in 1967 that "[i]n support of the American rule, it has been argued that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967). The widely respected Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit similarly recognized that "[t]he English rule deters litigation by (1) increasing the variance of the expected outcome of a lawsuit, and hence reducing the utility of litigation compared to settlement for the risk averse, and (2) penalizing more heavily errors in predicting the outcome of a lawsuit." Richard A. Posner, *The Economic Approach to Law*, 53 Tex. L. Rev. 757, 782 (1975).